**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:17-cr-00114** |
| | ) | |
| **SHAMAIN JOHNSON and** | ) | |
| **DEANTHONY BRYANT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

Before the Court are motions to suppress the evidence obtained during several vehicle stops. Specifically, Johnson and Bryant move to suppress evidence resulting from a stop on July 14, 2015 (Doc. Nos. 40, 45, 131); Johnson challenges stops on August 11, 2016 and February 13, 2017 (Doc. No. 68); and Bryant attacks a stop on February 21, 2017 (Doc. No. 61). The Government opposes all of the motions. (Doc. Nos. 43, 67, 73, 137.) After full briefing, the Court held a three-day evidentiary hearing. (Doc. Nos. 170-172, 176.) For the following reasons, the Court will grant Defendants' motions to suppress evidence obtained from the July 14, 2015 and February 13, 2017 vehicle stops. In all other respects, the motions will be denied.

I.      Relevant Law

    A.      Vehicle Stops and the Fourth Amendment

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Temporary detention of individuals during an automobile stop by the police, even if only for a brief period and a limited purpose, constitutes a "seizure" of "persons" within the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809-10 (1996); see also Brendlin v. California,

551 U.S. 249, 263 (2007) (vehicle stop is a seizure of passengers as well as drivers). The Court of Appeals for the Sixth Circuit "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." United States v. Blair, 524 F.3d 740, 748 (6th Cir. 2008). Any evidence seized during an illegal traffic stop must be suppressed as "fruits of the poisonous tree." Id. (quoting Wong Sun v. United States, 371 U.S. 471, 484 (1963)).

1.      Stopping a Vehicle for a Civil Infraction

A police officer may stop a car if he or she has probable cause to believe that a civil traffic violation has occurred. Blair, 524 F.3d at 748 (citing United States v. Sanford, 476 F.3d 391, 394 (6th Cir. 2007)). "Probable cause is a reasonable ground for belief supported by less than *prima facie* proof but more than mere suspicion." United States v. Jackson, 470 F.3d 299, 306 (6th Cir. 2006) (quoting United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990)). It does not require an actual showing of a violation; rather, a probability or substantial chance of a violation is sufficient. United States v. Christian, 925 F.3d 305, 2019 WL 2308021, at *4 (6th Cir. 2019) (citing United States v. Tagg, 886 F.3d 579, 585 (6th Cir. 2018)); United States v. Collazo, 818 F.3d 247, 254 (6th Cir. 2016).

The key question is whether the police officer actually "believe[d] that a traffic violation occurred." Sanford, 476 F.3d at 396 n.2. "The legality of the stop turns on the validity of the officer['s] objective explanation for making the stop, not on the subjective intentions of the officer[] in initiating the stop." United States v. Herbin, 343 F.3d 807, 809 (6th Cir. 2003); see also Whren, 517 U.S. at 812-13 (officer's subjective intent is irrelevant). The Court must focus on whether the particular officer who stopped a vehicle "had an objectively verifiable reason" for

doing so. United States v. Tullock, 578 F. App'x 510, 513 (6th Cir. 2014) (citing United States v. Hughes, 606 F.3d 311, 315-16 (6th Cir. 2010); Herbin, 343 F.3d at 809); see also Whren, 517 U.S. at 813. The Court does not focus "on whether a reasonable officer 'would' have stopped the suspect (even though he had probable cause to believe that a traffic violation had occurred), or whether any officer 'could' have stopped the suspect (because a traffic violation had in fact occurred), but on whether *this* particular officer *in fact* had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop." United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993) (emphasis added).

This is a fact-dependent analysis that turns "on what the officer knew at the time he made the stop." Id.; United States v. Valdez, 147 F. App'x 591, 594 (6th Cir. 2005). If the Court concludes that an officer "did not see the traffic violation" or "did not have probable cause to believe a violation had occurred" until events that occurred after the stop, it cannot find that probable cause existed. Ferguson, 8 F.3d at 391. The credibility of the officer and other witnesses is central to the probable cause determination, so "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Blair, 524 F.3d at 749 (quoting Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985)). Because "the whole is often greater than the sum of its parts," the final determination regarding probable cause must be made based on the totality of the circumstances. District of Columbia v. Wesby, 138 S.Ct. 577, 586-88 (2018); United States v. Arvizu, 534 U.S. 266, 277-78 (2002); Christian, 2019 WL 2308021, at *3-4.

2.    Stopping a Vehicle for Criminal Activity

Terry v. Ohio, 392 U.S. 1 (1968), governs traffic stops made on the basis of the reasonable suspicion of criminal activity. Id.; Arvizu, 534 U.S. at 273 (2002); United States v. Belakhdhar, 924 F.3d 925, 927 (6th Cir. 2019). The Government bears the burden of proving the existence of

reasonable suspicion by a preponderance of the evidence, United States v. Torres-Ramos, 536 F.3d 542, 552 (6th Cir. 2008), and the court evaluates reasonable suspicion based on the totality of the circumstances. United States v. Martin, 289 F.3d 392, 396 (6th Cir. 2002) (citing United States v. Roberts, 986 F.2d 1026, 1029 (6th Cir.1993)). The analytical framework involves two steps. First, the government must articulate specific facts that create reasonable suspicion for the initial detention. Id. (citing United States v. Torres-Ramos, 536 F.3d 542, 551 (6th Cir. 2008)). These specific facts must "warrant a man of reasonable caution in the belief that the action taken was appropriate." Terry, 392 U.S. at 21-22 (citations omitted). Critically, "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (citing Terry, 392 U.S. at 27).

If the initial detention based on reasonable suspicion is proper, then the second question is "whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and surrounding circumstances." Torres-Ramos, 536 F.3d at 551-52 (quoting United States v. Caruthers, 458 F.3d at 464 (6th Cir. 2006)); Terry, 392 U.S. at 19-20. In short, the second aspect of the Terry analysis is whether the detention is "limited in [both] scope and duration." Florida v. Royer, 460 U.S. 491, 500 (1983). This means that (1) a stop "must . . . last no longer than is necessary to effectuate the purpose of the stop," and (2) "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." United States v. Everett, 601 F.3d 484, 489-89 (6th Cir. 2010) (citing Royer, 460 U.S. at 500). The burden for both is on the Government. Royer, 460 U.S. at 500.

A vehicle stop for a civil traffic infraction is analogous to a Terry stop for purposes of the duration and scope limitations. Rodriquez v. United States, 135 S.Ct. 1609, 1614 (2015); United

States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999). "[B]ecause addressing the [traffic] infraction is the purpose of the stop, it may last no longer than is necessary to effectuate th[at] purpose," Rodriguez, 135 S. Ct. at 1614 (internal quotation marks and citation omitted), unless something occurs to create reasonable suspicion to justify a further detention. Blair, 524 F.3d at 752. In determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation." United States v. Sharpe, 470 U.S. 675, 686 (1985). Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." Illinois v. Caballes, 543 U.S. 405, 408 (2005). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez, 135 S.Ct. at 1615.

Under Terry, officers may extend a stop for a traffic violation beyond the scope of what was originally permissible if "something happen[s] during the stop to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot." United States v. Davis, 430 F.3d 345, 353 (6th Cir. 2005). In analyzing whether officers have impermissibly extended a traffic stop without reasonable suspicion of criminal activity, courts have "consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry." Everett, 601 F.3d at 492. "[T]he proper inquiry is whether the totality of the circumstances surrounding the stop indicates that the duration *of the stop as a whole* – including any prolongation due to suspicionless unrelated questioning – was reasonable." Id. at 494 (internal quotation marks and citations omitted). This requires examination of "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." Sharpe, 470 U.S. at 686. This diligence standard does not "require [an officer] to move at top speed," and some amount

of questioning is permissible so long as the officer's "overall course of action during a traffic stop, viewed objectively and in its totality, is reasonably directed toward the proper ends of the stop." Everett, 601 F.3d at 495.

B.     Consent to Be Searched

"In a society based on law, the concept of agreement and consent should be given a weight and dignity of its own." United States v. Drayton, 536 U.S. 194, 207 (2002). Accordingly, while the Fourth Amendment protects citizens against unreasonable searches and seizures, a search of a person is reasonable if that person gives free and voluntary consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Beauchamp, 659 F.3d 560, 571 (6th Cir. 2011). Consent is voluntary when it is "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." United States v. Moon, 513 F.3d 527, 537 (6th Cir. 2008) (internal citations omitted).

Voluntariness is a fact-specific inquiry determined by examining the totality of the circumstances. Bustamonte, 412 U.S. at 227; Schneckloth 412 U.S. at 226; United States v. Worley, 193 F.3d 380, 386 (6th Cir. 1999). The circumstances surrounding an individual's consent are examined objectively and a searching examination is required. See Whren, 517 U.S. at 813; Worley, 193 F.3d at 386. Several factors guide the examination. First, "a court should examine the characteristics of the accused, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights." Beauchamp, 659 F.3d at 572 (citing United States v. Jones, 846 F.2d 358, 360 (6th Cir. 1988)). Second, a court should consider the details of the detention, including the length and nature of detention, Bustamonte, 412 U.S. at 226; the use of coercive or punishing conduct by the police, id. at 226; and indications of "more subtle forms of

coercion that might flaw [an individual's] judgment." Beauchamp, 659 F.3d at 572 (quoting United States v. Watson, 423 U.S. 411, 424 (1976)). While the police do not have to inform an individual of his right to refuse consent, Ohio v. Robinette, 519 U.S. 33, 39-40 (1996), the absence of such a warning is to be considered in the totality of the circumstances analysis. Beauchamp, 659 F.3d at 572 (citing Bustamonte, 412 U.S. at 227). The Government's burden "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968).

II.     Analysis

Defendants argue that none of the four vehicle stops satisfy the Fourth Amendment to the U.S. Constitution. The Government disagrees. The Court considers each stop in turn.

A.      August 11, 2016 Stop

Johnson argues that detectives made an improper investigatory stop of his vehicle at a Hermitage, Tennessee car wash on August 11, 2016. He believes that Metro-Nashville Police ("Metro") detectives only became suspicious of him when he had a brief encounter with occupants of another vehicle suspected of illegal activity. Johnson contends, therefore, that there was no particularized suspicion to stop his vehicle.[1] The Government argues that the totality of circumstances establishes that Metro detectives had reasonable suspicion that Johnson was involved in an illegal drug transaction at the car wash. The Government specifically contends that detectives had suspected that the occupants of another vehicle had engaged in a type of gift card theft used to make drug transactions; detectives reasonably followed that vehicle to the car wash,

---

[1] Johnson also argues that there was a lack of suspicion for the stop of the other vehicle. However, he does have standing to challenge that search. United States v. King, 227 F.3d 743-51 (6th Cir. 2000).

which is a common location for drug transactions; and they witnessed behavior consistent with a drug transaction between Johnson and a passenger of that other vehicle.

At the suppression hearing, the Government presented then-Metro Detective Rory O'Farrell and Metro Detectives Erik Funk and Joseph Snyder. All were members of the Madison Crime Suppression Unit and spent a significant amount of their time surveilling retail parking lots where drug transactions occur. Each described the events of August 11, 2016.

O'Farrell first observed a male from a silver Saturn, later identified as Daniel Richardson, enter a Lowe's Home Improvement ("Lowe's") store with a plastic bag and return to the silver Saturn with what looked like a receipt in his hand. The detectives then saw a Lowe's employee follow Richardson and appear to write down the license plate number of the silver Saturn. A female, later identified as Toni Lance, then got out of the silver Saturn, went into the Lowe's, and exited with a drink in her hand. The detectives contacted Lowe's, and in response to information they received, decided to continue surveillance of the silver Saturn.

The detectives then followed the silver Saturn when it left the Lowe's parking lot. It first stopped briefly in an alley behind several pawn shops, and then it continued approximately eight miles to a car wash in Hermitage, an area also known for drug transactions. Upon arrival at the car wash, Johnson was already parked in one of the car wash bays in a white Nissan Altima. O'Farrell parked on the front side of the car wash, and the silver Saturn parked on the back side. He received radio updates from Funk and Snyder, who were parked across from the car wash. O'Farrell saw Lance exit the silver Saturn and walk towards Johnson's Nissan. She went out of view for a minute and then O'Farrell saw her come back into view and walk back to her car. O'Farrell testified that, based upon his experience and training, he believed Lance and Johnson had just met up for a drug transaction. O'Farrell then initiated the traffic stop on Johnson's vehicle, and Johnson was

detained. Johnson denied knowledge of any narcotics transaction. A Lowe's gift card and cash were recovered on Johnson.

Detective Funk's testimony was closely aligned with O'Farrell's version of events. However, Funk also testified that he actually saw Richardson exit the Lowe's with a gift card in his hand, and Lance return into the Lowe's with the gift card and exit with a drink. Based on training and experience that includes dozens of actual observations, Funk knows that it is common behavior for people to fraudulently obtain gift cards and then test the cards to be sure they are working and have a monetary balance. Funk also saw Lance leave the silver Saturn and go into the bay containing Johnson's car for 45-60 seconds. Funk, however, added the detail that when Lance left the bay he saw her "clutching something in her right hand."

Finally, Detective Snyder provided substantially similar testimony. Snyder, however, explained that, from his angle in the police cruiser, he could actually see Lance physically enter Johnson's white Nissan in the car wash bay and then leave with something "cupping [in] her hand." Considering the totality of circumstances, the Court finds that the detectives articulated a particularized and objective basis for having a reasonable suspicion, as opposed to a vague hunch, that Johnson was involved in criminal activity on August 11, 2016. The detectives' testimony was consistent and credible. Each testified based on their personal observations. Each had extensive knowledge of drug activity and schemes in the area. And each relied on their experience and training concerning such street narcotics activity. O'Farrell's testimony mirrors his Arrest Affidavit (Doc. No. 68-1), and the detectives' testimony, viewed together, is cohesive and logical. The detectives' credible testimony established, by a preponderance of the evidence, that Johnson was detained on August 11, 2016 because of a suspected drug transaction. Specifically, Lance walked towards Johnson's vehicle sitting unwashed in a car bay, left with something in her hands,

and returned to her vehicle. Taken together, these events could reasonably have been perceived by the detectives as a drug transaction. The Court concludes that the detectives had reasonable suspicion to stop Johnson's vehicle at the car wash and to detain Johnson for further investigation.

The motion to suppress the evidence obtained during the August 11, 2016 stop will be denied.

B.    February 21, 2017 Stop

Bryant argues that Metro detectives stopped his vehicle illegally on February 21, 2017. Specifically, he believes that alleged traffic violations were only a pretext for the stop; that detectives then wrongfully extended the stop after he produced his driver's license and registration; and that during the stop his consent to search his person was not voluntary but the product of a threat of a possible drug detection dog. Again, the Government disagrees. The Government offered the testimony of Metro Detectives Funk, Snyder, and Anthony Lopez to establish the reasonableness of this vehicle stop and their actions thereafter.

On February 21, 2017, Lopez was driving behind a red Camaro on Ewing Drive in Nashville when it accelerated and made a right hand turn onto Hillhurst Drive. He followed and observed the Camaro continue to accelerate and go through a four-way stop sign. (See Gov't Ex. 12 (intersection of Hillhurst Drive and Rich Acres Drive).) As the first person to observe the Camaro, he radioed other detectives and alerted them that the red Camaro was heading for Dickerson Pike and that it was a vehicle known for involvement in recent drug transactions. Lopez turned onto Dickerson Pike, following the Camaro as it continued making erratic lane changes in heavy traffic without signaling. He then lost the Camaro when it turned onto Donald Street.

Snyder heard Lopez's reports and saw the red Camaro speeding on Dickerson Pike and making erratic lane changes around cars and buses in a dangerous manner. He was not able to keep up, but he observed other detectives pick up the vehicle as it turned onto Donald Street.

When the Camaro turned off of Dickerson Pike onto Donald Street, Funk followed and saw the car make a U-turn in the middle of the intersection of Donald and Gerald Streets. (See Gov't Ex. 13 (map of intersection of Donald and Gerald Streets).) Like Lopez, Funk was familiar with the red Camaro because it was associated with the alleged drug activity of Defendant Johnson. Funk, riding along with Sergeants Roberts, then initiated the traffic stop of the red Camaro driven by Bryant.

Based on the totality of circumstances, the Court finds that there is a wealth of evidence that the initial stop of red Camaro was based on probable cause. The detectives' credible testimony is direct proof that Bryant had committed multiple traffic violations. Indeed, all three detectives directly witnessed Bryant violate traffic laws. First, Lopez witnessed the red Camaro speeding and driving through a four-way stop sign intersection. Tennessee law provides that "[e]very driver of a vehicle and every operator of a streetcar approaching a stop sign shall stop . . . at a clearly marked stop line. . . ." Tenn. Code. Ann. § 55-8-149(c). In this context, "stop" means "complete cessation from movement," something Bryant did not do. Tenn. Code Ann. § 55-8-101(63); see also United States v. Huff, 630 F. App'x 471, 478 (6th Cir. 2015). Second, Funk testified that he and Sergeant Roberts witnessed the red Camaro make a sudden U-turn in the middle of the dead-end street at the intersection of Donald and Gerald Streets. Tennessee law requires, however, that the driver of a vehicle intending to turn at an intersection shall only turn right, left, or in accordance with special turn lane instructions. Tenn. Code Ann. § 55-8-140. Bryant's U-turn was a clear traffic violation. Finally, Snyder observed the red Camaro speeding and weaving unsafely down Dickerson Pike.

Tennessee law provides that "[e]very driver who intends to . . . partly turn from a direct line, shall first see that that movement can be made in safety. . ." Tenn. Code Ann. § 55-8-143(a), and that "[t]he driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left thereof at a safe distance and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle," Tenn. Code Ann. § 55-8-117.

The Court finds that the initial stop of Bryant met constitutional requirements because detectives had ample probable cause to believe that Bryant had violated Tennessee traffic laws. The Court next considers whether the detectives improperly extended the scope or duration of the stop.

After the red Camaro was stopped, Snyder made contact with Bryant while Funk made contact with the passenger. Snyder made casual conversation with Bryant about the erratic nature of his driving. He sarcastically asked Bryant if he was driving in a "getaway" fashion from a crime. Bryant denied this. According to Funk, who could see and hear the conversation going on, "it was an easy stop," weapons were not drawn, and Snyder was not threatening Bryant. At some point, Snyder asked for consent to search Bryant's vehicle, which Bryant denied. Eventually, Snyder asked Bryant to get out of the car due to the possibility that a drug detection dog might be utilized for an open-air sniff. Next, Snyder asked Bryant for consent to search his person. At this time, Sergeant Roberts and Funk were still running Bryant's driver's license and warrant information over the radio system. According to Snyder, Bryant granted verbal consent for the search. The detectives testified that Bryant was not threatened and only Snyder and Lopez were near him at the time of the search. Snyder and Lopez estimated the entire stop had lasted five to seven minutes when Bryant was searched, while Funk put the estimate at five to ten minutes. Illegal drugs were located on Bryant's person.

Taken together, the detectives' testimony credibly establishes that after initiating the stop: (1) Sergeant Roberts and Funk began to check the occupants' driver's licenses and warrant records; (2) Snyder soon arrived and engaged Bryant in conversation about his dangerous driving; (3) within a few minutes, Bryant was asked to step out of the car and likely heard a reference to a drug detection dog; (4) within approximately three to four minutes, Bryant denied consent to search the Camaro; and (5) within approximately 5-7 minutes, while Roberts and Funk were still running the passengers' information, Bryant gave consent to search his person. The witnesses credibly and consistently testified that this part of the stop took less than ten minutes and there is no proof of any excessive questioning unrelated to the traffic stop. The detectives "diligently pursued the investigation." Sharpe, 470 U.S. at 686. They were in the process of making ordinary inquiries incident to the traffic stop, Caballes, 543 U.S. at 408, including license and warrant checks, Rodriguez, 135 S.Ct. at 1615. There is no evidence that the detectives impermissibly delayed their inquiries. The detectives' explanation about why the license and warrant checks took more than usual – i.e., due to use of hand-held radio channels because vehicle computers were unavailable – was credible and not seriously challenged by Bryant.

Counsel raised on cross-examination why Bryant was not issued a traffic citation. However, Lopez testified that it is a "very typical practice" that when more significant charges arise, detectives exercise discretion and "do not necessarily charge the minor charges." Likewise, Snyder testified that he has made hundreds, if not thousands of stops based on traffic violations, but rarely writes traffic tickets unless there is a major infraction related to an accident. This issue is of no consequence because the Supreme Court has made clear that a vehicle stop does not become unlawful just because the officer has determined in his own mind not to pursue the traffic violation for which the motorist was originally detained. Ohio v. Robinette, 519 U.S. 33 (1996);

see also <u>Herbin</u>, 343 F.3d at 810. The Court concludes that the duration and scope of the vehicle stop fell within constitutional bounds.

Finally, the Court considers the constitutionality of the search of Bryant. Here, the proof establishes that Bryant granted consent to search his person soon after denying consent to search his vehicle. This is odd. It is illogical that Bryant would deny consent to search his vehicle but consent to a search of his person. The only proof on this oddity comes from Snyder:

> In my experience it's not unusual. People who hide contraband on their person are very confident in their abilities because they've probably gotten away with it many, many times. And like I mentioned yesterday, many officers, maybe even most officers do not want to check certain areas -- as to why I cannot say. But it is not unusual for me in my -- at least in my experience that somebody would deny consent for a vehicle but they would provide consent for a person because they are confident in their abilities to secrete these items because they've probably done so many, many times and never had an issue and everything's been fine. I find that to be very frequent, to be honest.

Thus, Snyder was not surprised when Bryant's body tensed up in an attempt to evade a thorough search.

The Court does have serious concerns about this explanation. Indeed, the Court questions whether this oddity – i.e., denying permission to search his vehicle but then granting permission to search his person – is logical; especially when Bryant knew that the drugs were on his person and not in the vehicle. However, the Court must decide this issue based on the record before it. Here, the detectives' testimony regarding the request for consent is consistent. Snyder offered a reasonable explanation for Bryant's inconsistent behavior based upon his experience. There is no testimony of the use of violent tactics or any form of overt coercion or punishing conduct; weapons were not drawn; and no threats, physical or otherwise, were made. There is proof that a verbal reference was made, within Bryant's hearing, to calling a drug detection dog. However, there is

no evidence in the record that Bryant made any statement or engaged in any behavior suggesting that his consent was actually driven by fear of a drug detection dog. And that dog never arrived on-site, where it could perhaps have been subtly coercive.

Most importantly, Bryant offered no witnesses to counter the detectives' testimony or seriously challenge their applied field experience. Bryant has thus not offered the Court any basis in the record to tip the preponderance of the evidence against the Government. Rather, based upon the preponderance of the evidence, the Court concludes that Bryant's consent to be searched was intelligent, voluntary, and without duress. Moon, 513 F.3d at 537. Accordingly, the motion to suppress the evidence obtained from the February 21, 2017 stop will be denied.

C.    February 13, 2017 Stop

Johnson argues that Metro detectives made an improper investigatory stop of his vehicle at a Wal-Mart on February 13, 2017. According to Johnson, nothing rising to the level of reasonable suspicion had occurred at the moment detectives blocked his vehicle in its parking space. He believes that the detectives were acting only on a hunch or a feeling of drug activity that was confirmed after the illegal stop. Of course, the Government sees it differently. Namely, that detectives witnessed suspicious behavior by the occupants of two vehicles sufficient to seize Johnson's vehicle because a hand-to-hand drug transaction was in progress. At the suppression hearing, the Government offered the testimony of Metro Detectives Funk, Irwin, and Derrick Moore.

On February 13, 2017, while the Madison Crime Suppression Unit was conducting surveillance for drug activity in the Wal-Mart parking lot, Irwin and Moore witnessed a tan car enter the lot and park near a red truck. After only a few seconds, the tan car backed out, and the red truck followed to another parking space in the parking lot. Irwin and Moore testified that this

activity – driving, parking, driving, and parking in the same lot – caused them to be suspicious about a potential drug transaction. Their experience with narcotics activity in this Wal-Mart parking lot made them alert to parking/driving/parking activity. Moore and Irwin radioed for Funk to assist them.[2]

Moore admits that there was nothing inherently suspicious about the cars parking near each other the first time. As such, he had "no reason to make any kind of police interaction" when both cars parked for the second time in the Wal-Mart parking lot. The detectives conceded that the movement of the vehicles alone did not create reasonable suspicion. When the vehicles parked for the second time, Irwin and Moore parked a few positions down from the red truck and across the aisle from the tan car. The detectives saw the driver of the red truck get out of his vehicle, cross the aisle, and briefly pass by, and possibly speak with, the passenger of the tan car. Irwin confirmed that as of this moment – the :57 second mark on the video surveillance footage (Gov't Ex. 10) – he had not seen any criminal activity. The Court must therefore consider whether other factors or subsequent developments tipped the totality of the circumstances in favor of reasonable suspicion. The detectives must have developed reasonable suspicion by the time they engaged their vehicle lights and blocked Johnson's car, not after when they exited the police vehicle and approached his car on foot.

The detectives testified that their experience with drug deals in the Wal-Mart parking lot led them to be suspicious that the driving/parking/driving/parking behavior might develop into a "possible drug deal." Irwin explained three general categories the Madison Crime Suppression Unit uses to determine who is suspicious in parking lots, including: first, people who sit in a

---

[2] Funk took up a distant position in the parking lot and followed these events by radio, only arriving at the scene after the seizure of Johnson's car had occurred.

parking lot for a long time, and, second, people with their head down or looking over their shoulder who may be fixing needles, using drugs, divvying up drugs, or waiting on drug deliveries. Irwin agreed that neither of these categories apply here because the detectives saw no such activity.

The third category, according to Irwin, is "just when people are meeting" because "there's so many drugs in that area." He explained that the unit observes everyone, including people who just "meet with a loved one and [ ] get out of the car and [ ] hug." However, remarkably, he stated that he could not remember *any* situation where someone followed another person within a parking lot for a legitimate purpose.[3] He knows such behavior is an indicator of "trying to avoid police detection," so he is "just suspicious" of what those people are doing. His testimony, however, is inconsistent with testimony given by the other detectives that, in their experience, sometimes people *do* meet up for legitimate reasons (e.g., Craigslist or Let It Go transactions) in retail parking lots. This weakens Irwin's credibility. The Court is disturbed with his sweeping generalizations because the Supreme Court has noted that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." Wardlow, 528 U.S. at 124 (citing Brown v. Texas, 443 U.S. 47 (1979)).

There remains what happened when the driver of the red truck reached Johnson's car. According to Irwin, as the driver of the red truck passed the right front corner of the tan car, the detectives "started to roll up" the very short distance to stop behind the tan car "to take a closer look." Moore explained that the detectives "approach[ed] as quickly as [they] did" so that they could "catch them in the act" and confirm if it was a drug transaction. Irwin represented to the

---

[3] In response to an attempt at sympathetic questioning from counsel for the Government, Irwin stated that it "might" be possible that a husband might follow his wife to a store and park near her, but he personally has *never* observed "a situation like that."

Court that, "as [they] were getting closer to the vehicle," the detectives could see inside and see two males facing each other having a "physical interaction" with their hands. He engaged the police vehicle's lights because he witnessed this apparent "hand-to-hand transaction with the passenger." He further explained: "As we're rolling up, you know [Mr. Lee is] sitting in the car as we're rolling up. And whether I'm rolling up, I'm looking – you know I'm focused on that vehicle, plus I'm messing with steering wheel, lights, putting my car in park and I see the two turn towards each other. And of course detective Moore's out of the vehicle I would guess within seconds before me to get a better look at what exactly they're doing."

However, Irwin's version of events lacks credibility when viewed in light of all of the evidence. Irwin's factual narrative is put in doubt by the surveillance video. (Gov't Ex. 10.) The video reveals the following. Both vehicles parked opposite each other at :38 seconds. The driver of the red truck – Mr. Lee – exited his vehicle at :45 seconds and walked across the aisle towards the tan car. At :47 seconds, when Mr. Lee was halfway across the aisle towards the tan car, Irwin and Moore's police vehicle pulled forward in a parking spot parallel to the red truck and across the aisle from the tan car. Mr. Lee reached the rear bumper of the tan car at :49 seconds. He passed the passenger side of the tan car at :51 seconds and barely slowed. Mr. Lee moved around the right front corner of the tan car at :53 seconds. At :55 seconds, Mr. Lee rounded the front left corner of the tan car. At the same time, Irwin and Moore's police vehicle was *already* in rapid motion crossing the aisle. It was *perpendicular* to the tan car and less than three cars away. At :56 seconds, Mr. Lee appeared to sit down in the front seat of the tan car. In the next two seconds, the police vehicle rapidly closed the last few feet, driving close to the row of parked cars, and by :58 seconds it had engaged its lights and blocked the tan car. At 1:00, two full seconds after the car was seized

because it was blocked by the police car, the passenger and driver doors of the police car opened almost simultaneously, and Irwin and Moore exited and moved toward the tan car.

Neither the timing nor the angle of the police vehicle's approach support Irwin's version of events. He claims to have gotten a "closer look" and witnessed Mr. Lee "sitting in the [tan] car" engaged in what appeared to be "some type of hand to hand transaction with the passenger" while he approached in the police vehicle. But the video clearly shows that the police vehicle *began* moving rapidly toward seizing Johnson's car while Mr. Lee was *outside at the front of it*, and the police vehicle moved *perpendicular* down the aisle in a rapid manner that does *not* appear to allow Irwin a "closer look" into the tan car to see an ongoing drug deal. Importantly, Mr. Lee entered the tan car at :56 seconds on the video, and the police vehicle halted behind the tan car with lights flashing *no more than two seconds later*. Irwin's testimony that he had the time or vantage point to approach the tan car, look into it, and witness a purported hand-to-hand drug transaction is implausible.

Irwin's credibility suffers even further because his testimony is inconsistent with that of Moore. Irwin testified that Moore made the same observations about the tan car and then exited the police vehicle before him. Critically, however, Moore testified that it was only *after* the seizure – i.e., "as I exited my car" – that he saw the two individuals in the tan car turned toward each other engaged in a transaction with their hands. By this time, of course, Johnson had already been seized because his car was blocked by the police vehicle. Further, the video shows that the detectives exited their vehicle at almost exactly the same time, putting Irwin's account of Moore's actions also at odds with other evidence. (Gov't Ex. 10.) The Court therefore concludes that Irwin's testimony regarding the events of February 21, 2017 is neither consistent nor credible.

Combatting street-level drug crime is no doubt a difficult job. The detectives had options. They could have continued observations, adjusted their viewpoint, or exited their vehicles and observed the activity inside the tan car on foot. Instead, they rushed to seize Johnson's car. As Moore essentially revealed, the detectives were guessing there might be a drug deal happening and hoping to catch it "in the act" when they crossed the aisle, engaged their lights, and blocked Johnson's vehicle. The Government has not met its burden of articulating a sufficient objective basis to tip the balance in favor of a finding of a reasonable suspicion of criminal activity at the moment the detectives' seized Johnson's car. Rather, the evidence suggests that the detectives were operating on a mere hunch, however well-intentioned, that criminal activity was afoot.

The motion to suppress the evidence obtained from the February 13, 2017 stop will be granted.

D.    July 14, 2015 Stop

Johnson and Bryant argue that Tennessee Highway Patrol ("THP") Trooper Michael Kilpatrick made an improper investigatory stop of their vehicle on Interstate 40 in Hickman County, Tennessee on July 14, 2015. They both argue that Kilpatrick did not witness a traffic violation. Rather, they contend that the stop was a mere pretext, supported by inconsistent and improbable testimony, for drug interdiction.[4] The Government opposes the motion based on Kilpatrick's eyewitness testimony of a traffic violation that created probable cause to temporarily detain Johnson and Bryant. At the suppression hearing, the Government offered the testimony of

---

[4] Bryant also contends that Kilpatrick (1) improperly prolonged the time necessary to handle the supposed traffic offense without reasonable suspicion of criminal activity, and (2) used a potentially unreliable drug detection dog. Because this motion is resolved on the issue of the initial stop, however, the Court need not reach these questions.

Trooper Kilpatrick and THP Trooper Miller. Bryant offered the testimony of investigator Torrado O'Brian Carter.[5]

Kilpatrick was required to have probable cause to stop Johnson and Bryant for a traffic violation. This determination turns on Kilpatrick's "objective explanation for making the stop[.]" Herbin, 343 F.3d at 809. Kilpatrick says he witnessed Defendants' silver Chrysler following another vehicle too closely. Under Tennessee law, "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway." Tenn. Code Ann. § 55-8-124(a). Here, the only evidence on following another vehicle too closely is Kilpatrick's testimony. The Court, however, has substantial doubts about Kilpatrick's credibility.[6]

Kilpatrick is an experienced officer assigned to a THP interdiction team primarily in Hickman County, Tennessee. (Doc. No. 176 (hereinafter "Tr.") at 11-12.) Over his career, he has stopped vehicles for traffic infractions hundreds of times and seized drugs over 500 times. (Id. at 11-15.) On the morning of July 14, 2015, he sat in his vehicle at a crossover perpendicular to the eastbound lanes of Interstate 40 ("I-40") near mile marker 155. (Id. at 19.) At 8:47 a.m., the eastbound traffic was "moderate to heavy" with cars moving at "65 to 70 miles an hour." (Id.)

---

[5] Johnson offered testimony from investigator Marcus Caudel. However, without objection by the parties, the Court stopped this witness' testimony and ordered it stricken. (See Doc. No. 174 (striking testimony due to lack of foundation and incomplete disclosure of report).)

[6] In Collazo, the Court of Appeals discusses several methods commonly used for evaluating whether a vehicle is following another too closely, including the "car-length" rule and the "four-second rule." 818 F.3d at 255-57. The Court need not delve into these because the alleged following distance in this case (less than one car) would satisfy any legal measure for following too closely. The question before the Court is whether the Government has met its burden of proving that it is more likely than not that Kilpatrick had probable cause to believe that a violation for following too closely occurred at all.

Kilpatrick became aware of a particular silver Chrysler. Sergeant Greg Roberts had received a "BOLO"[7] from the Houston, Texas Police Department about a silver Chrysler with a specific New York license plate. (Id. at 17-18.) The car had an alleged connection to a drug stash house under investigation in Houston, but it had managed to leave that area without being stopped by police. (Id. at 18.) TBI Agent Owens, who was travelling westbound on I-40, radioed that he had just seen the silver Chrysler traveling eastbound. (Id. at 105, 119-120.)

According to Kilpatrick, within a very short period of time after Owens' radio call, the silver Chrysler came into his view immediately behind a blue car, at a distance of one-half mile down I-40. (Id. at 119-120.) Specifically, Kilpatrick saw a tractor-trailer in the right-hand lane, and a "line of [four] cars in the left-hand lane passing the semi." (Id. at 19-20.) The first two cars caught his attention because the second car was a silver Chrysler identified in the BOLO and it was following closely the car in front of it. (Id. at 20.) In front of the silver Chrysler was a blue car or, perhaps, a "little crossover type." (Id. at 20-21.) Kilpatrick saw the silver Chrysler as he looked at traffic coming eastbound, and he saw only a small gap between it and the car in front of it. (Tr. at 29-31.) He also saw the New York license plate as the Chrysler went by his location. (Tr. at 107.) He believed that the distance between the silver Chrysler and the blue car was too close, and he concluded that a traffic violation of "sustained closeness" at about 65 miles per hour had occurred. (Id. at 20-21.)

The Court has problems with Kilpatrick's credibility.

---

[7] A "whisper" or "BOLO" (i.e., "be on the lookout") is when "another agency or law enforcement officer provides information on criminal activity in a certain vehicle." (Tr. at 14.) Kilpatrick explained that he rarely stops vehicles on this basis alone because "[a] case is much stronger if there's probable cause." (Id. at 15.)

First, his testimony is inconsistent with his initial explanation of events on July 14, 2015. Kilpatrick concedes, as he must, that it is *important* for the accuracy of his report to correctly identify the lead car that was allegedly followed too closely. (Tr. at 20-21.) On the day of the stop, however, Kilpatrick wrote in the citation that the lead vehicle the silver Chrysler was following was *black*. (Def's Ex. 1.) Later, after watching his video of that day, Kilpatrick changed his explanation. (<u>See</u> Gov't Ex. 7.) Namely, the lead car Defendants were allegedly following too closely became *blue*, not black. At the hearing, Kilpatrick offered no convincing reason for this inconsistency.

Second, a further inconsistency lies with Kilpatrick's explanation of when he saw the New York license plate on the silver Chrysler. Here, he testified that it was as the Defendants' car approached him. He was impeached with his prior sworn state court testimony, however, in which he said he had seen the New York license plates when he first saw the silver Chrysler at a far distance. (Tr. at 116.)

Third, Kilpatrick's objective explanation of the traffic violation is questionable. After being advised of the BOLO and that the silver Chrysler had been spotted by a colleague on the other side of the road, Kilpatrick suddenly identified that exact car *committing a traffic violation a half-mile down I-40*. Kilpatrick's testimony on this subject was rote. His demeanor and behavior did not reflect credibility. The unlikeliness of Kilpatrick's observations was even highlighted by the Government's other witness – Trooper Miller – who testified that, based on his experience, even if the silver Chrysler was following another car at one full car length behind, it would not be possible to see it from as near as *one-quarter* of a mile away. Kilpatrick's unlikely testimony calls into question his entire testimony about the alleged traffic violation. <u>See United States v. Chesney</u>,

86 F.3d 564, 573 (6th Cir. 1996) (confirming that, based on credibility, the factfinder is free to believe everything that a witness said, or only part of it, or none of it at all).

Fourth, investigator Carter offered somewhat helpful testimony on this point. He conducted an experiment at the mile 155 crossover to test Kilpatrick's view. He concluded that it would be difficult "to see anyone tailing anybody" or license plates at a significant distance.[8] While Carter's observations were made looking through his camera, not by the naked eye, they are nonetheless somewhat informative. It was revealed during Carter's testimony that the bridge overpass to the west of Kilpatrick's position was only approximately 2100 feet away – i.e., well less than one-half mile. (See Gov't Ex. 14 (Google Map of I-40 with GPS measurements).) Based on that knowledge, Carter opined that he was sure that he could *not* see a target vehicle from the crossover beyond that distance at the bridge overpass. The presence of the bridge overpass at 2100 feet away from the crossover is therefore at odds with Kilpatrick's testimony regarding observing the silver Chrysler at a distance of one-half mile from the crossover, casting further doubt on Kilpatrick's credibility.[9]

Fifth, when the line of cars approached him, Kilpatrick did not immediately engage his vehicle's camera to capture objective evidence of a traffic violation. According to Kilpatrick, his dashcam camera was "malfunctioning" and so he could not manually start it. (Id. at 117.) He did not recall how long it had been malfunctioning or whether he ever asked that it be repaired or

---

[8] Carter conducted his initial experiment based upon a distance of three-quarters of a mile, premised upon Kilpatrick's even more generous testimony at state hearings. However, he explained that he nonetheless could not see the flashing lights of the "target car" until it was very close.

[9] The bridge overpass confused Kilpatrick as well. At one point, Kilpatrick testified that he "*first* observed" the silver Chrysler and blue car "between the bridge and first set of vehicles." (Tr. at 29-30.) This would clearly have been at a distance of well less than the one-half mile he otherwise claimed.

replaced. (Id.) However, there was "no suggestion" that the camera did not function properly when the vehicle's blue lights were engaged. (Id. at 118.) Curiously, Kilpatrick's belt microphone was also not working that day. (Id. at 118.) He also did not recall ever requesting a repair or replacement of that device. (Id.) These explanations of the malfunctioning and functioning of Kilpatrick's equipment create further doubt about the veracity of his testimony.

Regardless, the camera and car microphones in Kilpatrick's police vehicle *could* be triggered automatically by engaging the vehicle's blue lights.[10] Despite knowing this, however, Kilpatrick *did not* engage his blue lights, and no aspect of the actual alleged traffic violation was *ever* recorded. (Id. at 131-32.) The Court is very disturbed that Kilpatrick had this means to easily secure evidence of the purported traffic violation in progress – i.e., by engaging his blue lights (even briefly) from his position on the side of the road and triggering preservation of video of the cars passing by – but he chose not to do so. The words of Judge Aleta Trauger ring true in this case. "The failure to employ such simple technological means is particularly egregious here, given that [Kilpatrick] is a drug interdiction officer. Essentially, all of [Kilpatrick's] traffic stops are pretextual attempts to find illegal drugs. If a stop is successful at finding drugs, it is likely that the defendant will challenge the basis for the stop. . . . It is difficult to imagine a legitimate reason for not making all reasonable efforts to create objective, documentary evidence of a defendant's initial traffic violation." United States v. Ruiz, 832 F. Supp. 2d 903, 916 (M.D. Tenn. 2011). Indeed, Kilpatrick even *conceded* that, because he was facing perpendicular to I-40, engaging his vehicle's lights and camera "could have potentially captured the violation because you would have been able to see how close [the Chrysler] was to the vehicle in front of it." (Tr. at 33.) But, by his own

---

[10] When blue lights are activated, the camera system preserves a recording of the previous 30 seconds as well as all time going forward. (Tr. at 33.)

admission, Kilpatrick simply sat in his vehicle and watched the silver Chrysler pass by, and travel an entire one-half mile past him, before even pulling out onto the road. On cross-examination, Kilpatrick was asked why, if he knew there was a BOLO on the silver Chrysler and the legality of the stop would be questioned, he did not engage his lights and camera. (Id. at 109.) Remarkably, he responded that it was "not in [his] practice to do that." (Id.) Kilpatrick's failure to even attempt to secure objective evidence of the traffic violation further clouds his credibility.[11]

After finally pulling out onto I-40, Kilpatrick drove for *three miles* before activating his blue lights and triggering his police vehicle's camera and sound. (Id. at 36, 44.) Kilpatrick offered the explanation that he refrained from engaging his lights and camera because that section I-40 is "dangerous." (Id. at 32, 34-35.) The Government has not met its burden concerning this particularly conclusory assertion that inures to the benefit of Kilpatrick.[12] The Government supplemented Kilpatrick's testimony on this subject with a 3 inch by 8 inch google satellite-level map of I-40, with only one reference point along the road. The map consists of a three-inch, relatively straight pink line among a filled-in block of green. (Gov't Ex. 2.) With all due respect,

---

[11] The Court notes that, at the hearing, counsel for Johnson attempted to play an augmented version of a somewhat garbled audio tape of a roadside discussion between Kilpatrick and Agent Owens that occurred near the beginning of the stop. (Def. Enhancement of Gov't Ex. 6 (manually filed).) There were technical difficulties with this presentation of evidence and, in the end, the necessary equipment was not made available for the Court to benefit from the proffered enhancement. However, on the portion on the tape that was understandable, reference was made to following *an SUV*. One theory advanced by Johnson is that Kilpatrick was referring to the SUV that appears on the police video camera ahead of the silver Chrysler, and that Kilpatrick suspected those two cars were drug dealers traveling in tandem. According to Johnson, this conversation is another in a string of inconsistent events that suggests Kilpatrick was looking to make a stop based solely on suspected drug activity and not upon a well-prior independent traffic violation by the silver Chrysler. The Government argued in response that the tape revealed only that Kilpatrick was also wondering about that SUV.

[12] Indeed, this naked rationale – i.e., that an officer simply does not want to stop someone in a particular section of highway – could, without more, be used to justify leaving lights off and cameras untriggered for extended periods of time.

the purported "curves" in the road on this map appear so mild as to be unpersuasive. There are also three other Government exhibits consisting of pictures of that stretch of I-40, each of which shows basically straight roads. (Gov't Exs. 3, 4, 5.) And, indeed, when I-40 is captured on Kilpatrick's vehicle video, beginning at 8:48:20, the cars are driving on a straightaway without any apparently dangerous curves. (Gov't Ex. 6.) Finally, Kilpatrick's explanation of concern for "safety" is especially peculiar because, after riding without blue lights for miles due to supposed safety concerns, Kilpatrick then, admittedly, *created a safety problem* by engaging his blue lights at the exact time that required Defendants to cut in front of a tractor-trailer and skirt close to Trooper Miller's vehicle stop in progress. Indeed, at the hearing, Kilpatrick conceded that by doing so he had likely *caused* a "move over" violation by the driver of the silver Chrysler. (Tr. at 46.) He could state only that he was "not sure why he did that." (Id. at 99.)

Kilpatrick's credibility suffers even more based on his explanation of what happened when he pulled onto I-40. Kilpatrick doesn't "remember exactly the sequence of events" from 8:47, when he says the silver Chrysler passed his location at mile marker 155, to 8:49, when he completed the stop at mile marker 159. (Id. at 167.)  According to Kilpatrick, after inexplicably waiting for the silver Chrysler to drive one-half mile past him, he pulled out at 8:47 and began to catch up. Kilpatrick stated that, at some unknown time after that, the silver Chrysler must have passed the blue/black car in front of it and drove free and clear of the truck and the line of cars. According to Kilpatrick, there was heavy traffic and he was travelling near 80 miles per hour, passing cars and maneuvering to stop the silver Chrysler. But at the hearing, he had no *specific* memories of *any of this*. Kilpatrick revealed little memory of the details of those three and one-half miles (Id. at 167-172). There was "moderate to heavy traffic" (id. at 104-105, 168) and yet, according to Kilpatrick, he pursued the silver Chrysler at "80 miles per hour" and "maybe . . . 90"

or, at least, "probably exceeding the speed limit" while "passing cars." (Id. at 56, 102, 169, 172.) He assumed the silver Chrysler must have "pulled out and passed the [blue] car," but he did not know when or at what point the lineup of cars changed. (Id. at 42.) He did not remember how many, *if any*, cars were on the road for the *entire* distance. He did not even remember passing *any* of the cars in the original line. (Id. at 167-172.) Kilpatrick does, however, remember what occurred in the last moments before the stop for which video *was* preserved. Specifically, he remembers that he was in the left lane of I-40 travelling 62-63 miles per hour, and the silver Chrysler was alone in the right lane traveling at around the same speed. (Id. at 54-55.) He activated his lights and detained the Chrysler around mile marker 159. (Id. at 44, 178.)

The video does not shine a kind light on Kilpatrick's version of events. (Gov't Ex. 6.) When the video system starts preserving footage at *8:48:20 a.m.* – 30 seconds before the blue lights are engaged – the silver Chrysler is travelling, almost casually, in the right lane of I-40 at a speed of 63 miles per hour or less, with only one tractor-trailer and one SUV far ahead. There is no sign of heavy traffic, the Chrysler or police vehicle are not travelling at very high speeds, nor are they passing any cars. The police vehicle, in the left lane, travels the same speed as the Chrysler for 30 seconds on a long, predominantly straight stretch of road. This means that everything Kilpatrick vaguely testified to purportedly took place in *just over one minute* between 8:47 and 8:48:20. This is simply implausible. Even more so because, after the fevered events of that impossible minute, Kilpatrick was content to ride behind the wanted silver Chrysler for thirty more seconds before initiating a stop.

Finally, the Court has concerns about Kilpatrick's demeanor on the stand. See Peveler v. United States, 269 F.3d 693, 702 (6th Cir. 2001). He is a long-time criminal interdiction officer and yet appeared to be nervous when testifying. His memory was significantly challenged on

discrete subjects multiple times, while apparently quite good on others, and at times his testimony seemed to be based more on his review of the contents of his narrative report and the vehicle video than independent recollection. See, e.g., United States v. Wallace, No. 1:04-CR-96, 2005 WL 2922226, at *9 (E.D. Tenn. Nov. 3, 2005). Furthermore, his general demeanor appeared to reflect that he felt a personal pride or stake in the outcome of this matter. Ruiz, 832 F. Supp. 2d at 914.

In sum, it is clear from the evidence that Kilpatrick and his colleagues wanted to stop the silver Chrysler for drug interdiction after receiving the BOLO. To do that by means of a traffic violation, however, the law required one of the officers to have probable cause. The only evidence offered by the Government that Johnson and Bryant violated a Tennessee traffic law before the July 14, 2015 stop was Kilpatrick's testimony. The Court of Appeals has upheld the denial of motions to suppress evidence obtained from vehicle stops where probable cause was based upon a traffic violation of following too closely in cases where the only evidence has been an individual officer's testimony. See, e.g., Collazo, 818 F.3d at 256; Sanford, 476 F.3d at 393; United States v. Kelley, 459 F. App'x 527, 532 (6th Cir. 2012); United States v. Jimenez, 446 F. App'x 771, 772 (6th Cir. 2011); United States v. Walton, 258 F. App'x 753, 754, 756-57 (6th Cir. 2007). However, these cases either had video evidence confirming the violation or lacked significant questions as to the credibility or reliability of the reporting officer. In light of the compelling weaknesses in Kilpatrick's credibility, the Court cannot conclude on this record that it is more likely than not that he observed Johnson and Bryant's vehicle following a car too closely before the July 14, 2015 stop. The Government has not met its burden of demonstrating, by a preponderance of the evidence, that Kilpatrick saw a traffic violation or had probable cause to believe that one occurred, The Court concludes that the stop did not satisfy the Fourth Amendment.

The motion to suppress evidence obtained from the July 14, 2015 stop will be granted.

III.     Conclusion

For the foregoing reasons, the July 14, 2015 and February 13, 2017 vehicle stops were not justified at their inception and violated the Fourth Amendment. All evidence seized as a result of those stops must be suppressed as "fruits of the poisonous tree." Accordingly, Bryant and Johnson's motions to suppress concerning the July 14, 2015 and February 13, 2017 stops will be granted. The motions will be denied in all other respects.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE